639 So.2d 864 (1994)
Wanda THOMPSON, Plaintiff-Appellant,
v.
LOUISIANA DEPARTMENT OF TRANSPORTATION, et al., Defendants-Appellees.
No. 93-1294.
Court of Appeal of Louisiana, Third Circuit.
June 29, 1994.
*866 Chris Smith III, Jack L. Simms Jr., Leesville, for Wanda Thompson.
James Lynn Davis, Many, for the State, DOTD.
Before SAUNDERS and DECUIR, JJ., and BERTRAND[1], J. Pro Tem.
SAUNDERS, Judge.
Plaintiff-appellant, Wanda Thompson, appeals from the trial court's judgment finding defendants-appellees, Louisiana Department of Transportation and Development, et al (hereinafter DOTD), not liable for plaintiff's injuries sustained in a fall at Toledo Bend Lake.
For the reasons which follow, we reverse the trial court's judgment.

FACTS
Wanda Thompson (hereinafter THOMPSON) and her husband, Robert Thompson, leased a trailer site at Park Site 15 at Toledo Bend Lake. The lake and camp sites are operated by the State of Louisiana through the Department of Transportation and the Sabine River Authority. The Thompsons moved their trailer to that location in January or February of 1990. Because THOMPSON had poor eye sight and was considered legally blind, the Thompson family cleaned up the area around the camp site and marked rocks and stumps with illuminative paint to assist her in walking around the area safely.
On the evening of April 14, 1990, THOMPSON walked her daughter, Nicole, to a neighbor's trailer where she would stay while THOMPSON and her husband went fishing. En route back to her trailer, THOMPSON fell into an underground trash receptacle. As a result of the fall, she received minor scrapes and bruises, but seriously injured her right shoulder. She underwent two surgeries to correct the damage to her right shoulder. The pain from the damaged shoulder continued after the surgeries and doctors believed that the only way to relieve the pain was to have a bilateral breast reduction performed. That surgery was performed and nominally succeeded in reducing THOMPSON'S recurring pain. One more shoulder operation was recommended, but had not been performed at the time of the trial.
While the trial court did not doubt that THOMPSON had sustained a shoulder injury, after reviewing the evidence presented at trial, it reached the conclusion that it was impossible for THOMPSON to have been injured in the manner she described. Consequently, the trial court found that THOMPSON failed to show by a preponderance of the evidence that DOTD's negligence caused or contributed to the injury or that the garbage receptacle in which THOMPSON alleges she fell was defective or created an unreasonable risk of harm.

I. Issues Presented
Whether the trial court committed manifest error or was clearly wrong in finding that plaintiff-appellant's accident did not occur as alleged, and therefore, defendant was not liable for her injuries.
The manifest error and clearly wrong rule applies when this court reviews the factual findings of the trial court based on live testimony and/or depositions. See, Castille v. Great Atlantic & Pacific Tea, 591 So.2d 1299 (La.App.3d Cir.1991). "It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of `manifest error' or unless it is `clearly wrong.'" Rosell v. Esco, 549 So.2d 840, 844 (La.1989). Consequently, this court may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though we may feel *867 that our own evaluations and inferences are as reasonable. See, Id.
"The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.
"When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong."
Id. at p. 844-45 (citations omitted).
After a careful review of the record, we find that the trial court's conclusions were "clearly wrong" and that it committed "manifest error" when it found that the evidence failed to support THOMPSON'S claim. Consequently, we are required to redetermine the facts de novo from the entire record and render a judgment on the merits. Id. at p. 844.
The Louisiana Civil Code provides that "[e]very person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill." La.C.C. art. 2316. In addition, "[w]e are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody." La.C.C. art. 2317. LSA R.S. 9:2800 provides:
"A. A public entity is responsible under Civil Code Article 2317 for damages caused by the condition of building within its care and custody.
"B. Except as provided for in Subsection A of this Section, no person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so."
"The owner or person having custody of immovable property has a duty to keep property in reasonably safe condition and must discover any unreasonably dangerous condition on the premises and either correct that condition or warn potential victims of its existence." Bradford v. Louisiana Downs, Inc. 606 So.2d 1370, 1374 (La.App.2d Cir. 1992); see also, Albritton v. J.C. Penney Co., Inc., 385 So.2d 549 (La.App.3d Cir.), writ denied, 393 So.2d 727 (La.1980). "Also, property owners must keep their premises free of defects or conditions in the nature of hidden traps, dangers or pitfalls, which are not known to the visitor and which would not be observed by him in the exercise of reasonable care." Silliker v. St. Landry Police Jury, 520 So.2d 880, 886 (La.App.3d Cir. 1987) (citing Calhoun v. Royal Globe Insurance Company, 398 So.2d 1166 (La.App.2d Cir.1981).
THOMPSON asserts that DOTD is liable under both negligence and strict liability theories of tort. The Louisiana Supreme Court addressed these two theories of recovery:
"In a typical negligence case against the owner of a thing (such as a tree) which is actively involved in the causation of injury, *868 the claimant must prove that something about the thing created an unreasonable risk of injury that resulted in the damage, that the owner knew or should have known of that risk, and that the owner nevertheless failed to render the thing safe or to take adequate steps to prevent the damage caused by the thing. Under traditional negligence concepts, the knowledge (actual or constructive) gives rise to the duty to take reasonable steps to protect against injurious consequences resulting from the risk, and no responsibility is placed on the owner who acted reasonably but nevertheless failed to discover that the thing presented an unreasonable risk of harm.
"In a strict liability case against the same owner, the claimant is relieved only of proving that the owner knew or should have known of the risk involved. The claimant must still prove that under the circumstances the thing presented an unreasonable risk of harm which resulted in the damage (or must prove, as some decisions have characterized this element of proof, that the thing was defective). The resulting liability is strict in the sense that the owner's duty to protect against injurious consequences resulting from the risk does not depend on actual or constructive knowledge of the risk, the factor which usually gives rise to a duty under negligence. Under strict liability concepts, the mere fact of the owner's relationship with and responsibility for the damage-causing thing gives rise to an absolute duty to discover the risks presented by the thing in custody. If the owner breaches that absolute duty to discover, he is presumed to have discovered any risks presented by the thing in custody, and the owner accordingly will be held liable for failing to take steps to prevent injury resulting because the thing in his custody presented an unreasonable an unreasonable risk of injury to another.
"Thus, while the basis for determining the existence of the duty (to take reasonable steps to prevent injury as a result of the thing's presenting an unreasonable risk of harm) is different in C.C. Art. 2317 strict liability cases and in ordinary negligence cases, the duty which arises is the same. The extent of the duty (and the resulting degree of care necessary to fulfill the duty) depends upon the particular facts and circumstances of each case.
"Accordingly, in a strict liability case in which the claimant asserts that the owner's damage-causing thing presented an unreasonable risk of harm, the standard for determining liability is to presume the owner's knowledge of the risk presented by the thing under his control and then to determine the reasonableness (according to traditional notions of blameworthiness) of the owner's conduct, in the light of that presumed knowledge."
Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982).
It is undisputed that DOTD owned and held in its custody the alleged injury causing "thing." Also, it undisputed in this case that DOTD had actual knowledge of the existence of the decaying underground trash receptacles. Because DOTD knew of the existence and use of the defective cans on property that it owned and maintained, the appropriate legal analysis of a personal injury claim is the same under either theory. Consequently, THOMPSON can recover if she proves by a preponderance of the evidence the remaining two elements: (1) that the property was defective because it had a condition that created an unreasonable risk of harm to persons on the premises and (2) that the defect or unreasonable risk of harm posed by the property was a cause-in-fact of the resulting injury.
We first address whether the thing presented an unreasonable risk of harm to persons. "Whether there was a condition on the property which created an unreasonable risk of harm is a legal question." Bradford, 606 So.2d at 1375. In management of its property, a property owner must act as a reasonable man in view of the probability of injury to others; consideration should be given to the nature of the facility and the dangers presented by it. Thompson v. Ewin, 457 So.2d 303 (La.App.3d Cir.), writ denied, 460 So.2d 1043 (La.1984) (citing Walker v. Union Oil Mill, Inc. 369 So.2d 1043 (La. 1979) and Shelton v. Aetna Casualty & Surety *869 Company, 334 So.2d 406 (La.1976)). In deciding the issue of whether property poses an unreasonable risk of harm to persons, the court must consider "the moral, social, and economic values as well as the idea of justice in reaching an intelligent and responsible decision." Thompson, 457 So.2d at 306. "This is determined by weighing the risk and gravity of harm against the social utility of the activity and the cost of prevention." Id. (citing Hunt v. City Stores, Inc., 387 So.2d 585 (La.1980)).
The record in this case reveals that underground trash receptacles were installed at Toledo Bend Lake in approximately 1972. Those underground trash receptacles had a low profile; they were recessed or installed in holes flush with the ground. The manufacturers of the cans advertised them as being "out of sight." The opening to the cans were covered by lids that were connected to the tops of the cans by hinges. No signs were placed around the cans to indicate their location and evidence elicited from DOTD'S maintenance supervisor, Ervin Fiscus, indicates that they were often covered by debris and grass.
The uncontroverted testimony at trial indicates that the underground trash receptacles had begun to deteriorate and rust; they had outlived their useful life. DOTD'S own maintenance supervisor, who oversaw the removal of these cans, noted that many of them had rusted out. In particular, he noted, after viewing the can in which THOMPSON fell, that the hinges or rivets on the lid of the can had rusted out and that the lid of the can was loose and only held in position by the lip of its lid.
While underground trash receptacles are not per se unreasonably dangerous, we find that, as a matter of law, when they begin to rust and deteriorate, as the record in this case reveals, DOTD has a duty to insure that the lids fit securely on the cans and operate properly. DOTD had an obligation to replace the hinges, the lids or remove the defective cans. In the alternative, DOTD should have given visitors reasonable warnings of their existence. In view of the cans' low profile and inconspicuous position, and their deteriorated condition, they posed a serious risk of harm to persons walking, hiking, or playing about the grounds of the park. An unwary camper or hiker, who walked upon or stumbled upon an "out of sight" can would not suffer any injury as long as the lid operated properly and remained in place. In this case, however, the can that THOMPSON stumbled upon had lid hinges that were defective; they were rusted out and no longer secured the lid in its proper position.
In ruling whether the underground trash receptacles present an unreasonable risk of harm, we balance the social utility of the cans with the risk and magnitude of harm that their use presented. The record reveals that the cans no longer served their objective, i.e. to prevent dogs and animals from getting into trash cans and spilling garbage onto the ground. DOTD admitted that due to inconsistent trash collection the trash in the underground trash receptacles often built up beyond capacity and littered the ground. We find nothing in the record that DOTD encouraged the use of the underground trash receptacles nor did they specifically mention to campers their locations. Indeed, DOTD employees, Linda Parks and Ervin Fiscus, admitted that at the time of THOMPSON'S accident, DOTD had already adopted plans to remove the cans because the cans were unsightly and their use kept the park grounds untidy. At the time of THOMPSON'S accident, DOTD had already begun to install fifty-five (55) gallon trash barrels above the ground for trash collection. While the testimony indicated that some campers still used the underground cans to hold their trash before relocating it to a centrally located dumpster, we find that the underground trash receptacles had little or no social utility. Moreover, the small amount of utility, if any, was grossly outweighed by the serious risk of harm that the deteriorated cans presented to persons on the premises.
In reviewing the cost of removing the risk of harm, we find it to be moderate. Based on an inventory of aged and broken underground trash receptacles that had already been made by DOTD personnel, DOTD could have easily repaired the defective cans, filled them in with dirt, or removed them from the *870 park, which it did shortly after THOMPSON'S accident. At a minimum, a reasonably prudent person would have warned visitors of their locations upon entering the park or placed stakes or flags near the defective cans to indicate their locations.
We next address the issue of whether THOMPSON'S injuries were caused-in-fact by DOTD'S breach of duty to repair, replace, or warn of the location of the aging underground trash receptacles. We have reviewed the evidence and find that THOMPSON'S injuries were caused by the defective underground trash receptacle located near her leased camp site in Park Site 15.
In the trial court's reasons for judgment, it noted that it had no doubt that THOMPSON was injured. The trial court, however, failed to find DOTD liable ruling that the evidence presented at trial did not prove by a preponderance that THOMPSON fell in the can the way she alleged. The pertinent factual issue to be decided at trial was whether the defective can caused her to fall and injure herself and not the manner in which she fell. DOTD is liable whether she slipped and then fell into the can or walked directly on top of the can and fell.
The facts and circumstances surrounding the accident clearly support THOMPSON'S claim. THOMPSON tripped on or near the trash receptacle at Site 15 and fell into the can. The facts of the accident were corroborated by THOMPSON'S husband, Robert, whose testimony was consistent with THOMPSON'S. Robert Thompson heard the screams for help from his wife and went to her aid minutes after the fall and saw her in the underground can. Ronnie Shelton, THOMPSON'S fifteen year old son, testified that he was inside the camper at the time of the accident. He, too, heard the screams of his mother and ran outside to investigate and observed his stepfather, Robert Thompson, pulling THOMPSON from the hole. Roger Deason, a neighbor of the Thompsons, also heard THOMPSON calling out for help and observed that she had fallen into the underground trash receptacle. Additionally, the medical histories taken by physicians at the time they treated THOMPSON and the accident report prepared by DOTD personnel a day after the accident are consistent. DOTD'S maintenance supervisor, who visited the accident scene, even noted an indention in the soil just outside the rim of the can where THOMPSON alleges that she broke her fall with her elbow.
In support of our finding that the trash receptacle was defective, Robert Thompson and Ronnie Shelton, who both visited the accident scene, observed that the lid was not on the top of the can, but on ground in front of the can. DOTD'S own maintenance supervisor admitted that the underground trash receptacle in which THOMPSON fell had hinges or rivets that were rusted out and the top did not fit properly on the can. Moreover, another DOTD employee, Claudette Howell, a clerk III at Park Site 15, testified that she had seen the defective can before the date of the accident and noticed that its hinges were rusty and that the lid of the can could just slide off.
The type and location of THOMPSON'S injuries were overwhelmingly supported by medical evidence and were clearly consistent with someone who fell in an underground can. Specifically, Dr. Lynn Foret, who performed the two shoulder operations on THOMPSON, testified that the rotator cuff injury would have been caused by THOMPSON'S aducting her arm to break her fall. Mindful of the manner in which THOMPSON fell, i.e., she broke her fall with her elbow, and the indention in the soil around the rim of the can observed by the DOTD maintenance supervisor, we find the evidence clearly supports THOMPSON'S claim.
We find no evidence to support a finding that she was at fault or that some other third party was at fault for her injuries. Notwithstanding her poor eyesight, we find nothing in the record to indicate that she was not exercising ordinary care under the circumstances. In view of the overwhelming evidence substantiating THOMPSON'S claim, we find that the trial court's ruling was not reasonable. When reviewing the evidence, we find that there was only one permissible view of the what occurred in this case: THOMPSON stepped on or slipped near the defective underground trash receptacle at Park Site 15 and fell into the can.
*871 "The court of appeal may fix the quantum in a suit for damages, where the plaintiff's demands based on liability were rejected at trial, but the court of appeal reverses the liability finding on appeal." Courville v. Piggley Wiggly Bunkie Co., 614 So.2d 1366, 1370 (La.App.3d Cir.1993) (citing Guillory v. Keel, 502 So.2d 1159 (La.App.3d Cir.), writ denied, 505 So.2d 1144 (La.1987). Additionally, "[i]n making an initial award of damages at the appellate level, we are not limited to an award of either the lowest or highest amount we would affirm. Rather, we set the award in an amount which is just compensation for the damages revealed by the record." Savelle v. Heilbrunn, 552 So.2d 52, 59 (La. App.3d Cir.1989), writ denied, 556 So.2d 1267 (La.1990) (citing Lee v. Great Southwest Fire Ins. Co., 493 So.2d 789 (La.App.2d Cir.1986)).
"The primary objective ... in fixing the award in a personal injury case is to adequately compensate the injured person for his injury under facts shown to exist in the case." Berthelot v. Leday, 606 So.2d 1, 3 (La.App.3d Cir.1992) (citing Reck v. Stevens, 373 So.2d 498 (La.1979)). "The primary considerations in assessing damages are severity and duration of injured party's pain and suffering." Holt v. Rapides Parish Police Jury, 574 So.2d 525, 529 (La.App.3d Cir.1991).
THOMPSON'S injuries are severe and extensive. The shoulder injury required two surgeries under general anesthesia. The doctors found a severe rotator cuff tear and tears in the cartilage that holds the shoulder in the socket. After the shoulder surgery, doctors recommended that she have breast reduction surgery to alleviate the added pain her large breasts caused her debilitated and weakened shoulder. The breast reduction succeeded nominally in reducing the pain in her shoulder and pain to a pre-existing back injury. The breast reduction operation, as well as the shoulder surgeries, were painful and left surgical scars.
As a result of the accident, THOMPSON has had recurring pain on a regular basis and has had to seek treatment for pain and the replacement of her shoulder in the socket on numerous occasions at the hospital emergency room. The medical evidence indicates that she will have problems with her shoulder for the rest of her life including recurring pain and subluxating of the shoulder[2]. The medical evidence reveals that THOMPSON has suffered approximately twenty (20%) to thirty (30%) percent permanent disability of the shoulder depending on whether she has the third operation that her doctor recommended and the effectiveness of the procedure. This third shoulder operation is expected to increase the mobility and use of her shoulder by as much as ten percent (10%).
Among the factors to be considered in determining the amount of an award for future economic loss are plaintiff's physical condition prior to the accident, his past work record as to consistent employment and the amount of his earnings, and the probability that he would have continued to earn wages over the remainder of his working life as he had in the past had he not sustained the injury. Jaffarzad v. Jones Truck Lines, Inc. 561 So.2d 144 (La.App.3d Cir.1990), writ denied, 565 So.2d 450 (La.1990). "Factors which [also] should be considered in assessing such an award include age, life expectancy, work life expectancy, investment income factor, productivity increase, prospects for rehabilitation, probable future earning capacity, loss of future earning capacity, loss of earning ability, and inflation." Guidry v. Sam Grimmet, Inc., 557 So.2d 249, 253 (La. App.3d Cir.1989), writ denied, 558 So.2d 557 (La.1990) (citations omitted). Finally, we note: "Past work history is of extreme importance when calculating amount due for economic loss or loss of income." Morris v. Highlands Ins. Co., 525 So.2d 125, 129 (La. App.3d Cir.1988) (citing Wactor v. Pickens Lumber Co., 505 So.2d 815 (La.App.2d Cir. 1987), writ denied, 508 So.2d 827 (La.1987)).
Concerning future loss of wages and loss of earning capacity, we hold that, while the medical evidence shows that the damages to THOMPSON'S shoulder are severe, THOMPSON can return to work in the same capacity or in the same employment fields by which she was already limited due to her pre-existing injuries and medical conditions. *872 Her primary treating physician, Dr. Foret, testified that THOMPSON could resume some type of sedentary work with limited lifting, which is the only type of work that she was capable of performing prior to the accident. Accordingly, we find no loss of earning capacity. We do find, however, that THOMPSON will in all probability have the third shoulder surgery performed as recommended by her doctor. We find that this third operation with post operative care will require THOMPSON to miss ninety-days of work, and therefore, award $5,000.00 for future loss of wages.
We reviewed her past history of work, pre-existing disabling injuries, and the testimony of experts who testified concerning the economic impact of THOMPSON'S accident. The record reveals that before THOMPSON became involved in the snack bar business she had worked for the federal government. Because of medical conditions and injuries unrelated to the accident in this case, she was no longer able to perform those tasks. Should the status of those pre-existing injuries change enabling THOMPSON to resume this earlier work, we find nothing in the record that indicates that the injuries sustained in this accident would prevent her from doing so.
THOMPSON has shown by a preponderance of the evidence some past loss of wages. The evidence indicates, however, that her inability to continue operating her vending machine and snack bar business was also due to a back injury unrelated to her fall at Toledo Bend. In determining the amount of an award, we find it too speculative for this court to base an award of loss of wages on the profit and loss report of a business that THOMPSON only operated for approximately three months. A past loss of wage calculation based on that report would not be reasonable or fair. We find that the only reasonable basis to use in determining past loss wages is her past income tax returns. Based on those returns and our finding that the accident caused her to be incapacitated for approximately one (1) year, we award $20,000 for past loss of wages.
While THOMPSON argues for an award of damages for household services, she presented little or no evidence to support her claim. She presented little or no evidence of a special need for household services much less any reliable records or receipts for payments made for such services.
In determining an award for the past and future pain and suffering, the loss of the enjoyment and use of her shoulder, and the scars caused by the multiple surgeries, we award $175,000. THOMPSON will never have the same use of her right shoulder as she did prior to the accident. The medical evidence indicates the use of her shoulder will be even more limited as she grows older. We note that the weakened and damaged shoulder required her to undergo a bilateral breast reduction. While the accident was not the sole reason for the surgery, we find that the added pain from the accident precipitated breast reduction surgery that otherwise would only have been a discretionary or elective procedure.
In considering the amount to award for past and future medical expenses, we have reviewed the evidence introduced by THOMPSON in the form of invoices and bills for doctors fees, prescription drugs, diagnostic tests, and physical therapy. The record reveals past medical expenses in the amount of $39,350.60. In addition, we find that THOMPSON will have the surgical procedure recommended by Dr. Foret, THOMPSON'S primary treating orthopedist. Based on Dr. Foret's cost estimates and aware of the costs ordinarily associated with hospital stays, we find that THOMPSON'S future medical costs for the third surgery will be $10,000.00. Therefore, we award $39,350.60 for past medical expenses and $10,000.00 for future medical expenses or a total of $49,350.60 for past and future medical expenses.

Conclusion
For the foregoing reasons, the judgment of the trial court is reversed.
It is ORDERED, ADJUDGED, and DECREED, that judgment is rendered in favor of the plaintiff, Wanda Thompson, and against the Louisiana Department of Transportation and Development and the Sabine River Authority in the amount of $249,350.60 *873 for general and special damages, plus legal interest from the date of judicial demand until paid. Costs of this appeal are assessed to the Louisiana Department of Transportation and Development and the Sabine River Authority.
REVERSED and RENDERED.
NOTES
[1] Judge Lucien C. Bertrand, retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.
[2] A medical term describing the dislocation of the shoulder from its socket.