744 So.2d 649 (1999)
Meng SENGSOULY, et al., Plaintiffs-Appellants,
v.
ALLSTATE INSURANCE COMPANY, et al., Defendants-Appellees.
No. 99-22.
Court of Appeal of Louisiana, Third Circuit.
June 9, 1999.
Rehearing Denied July 21, 1999.
Writ Denied November 19, 1999.
*651 Andre F. Toce, Lafayette, for Meng Sengsouly et al.
Philip Stephen Aucoin, Jr., Lafayette, for Allstate Insurance Company, et al.
Preston D. Cloyd, Lafayette, for State Farm Mutual Automobile Ins. Co.
BEFORE: YELVERTON, THIBODEAUX, and SAUNDERS, Judges.
YELVERTON, J.
Meng Sengsouly and her husband Kien appeal a jury's award of damages for injuries Meng sustained as a result of an automobile accident. It was stipulated prior to trial that Oldon Dugas was solely at fault in causing the accident which injured Meng. The accident happened in September 1996 when Dugas failed to stop at a red light and collided with a vehicle in which Meng was a front seat passenger. Meng was taken to Dauterive Hospital in New Iberia where a cut on her forehead was stitched, and she was admitted for treatment of a fracture to her right arm. Since liability was stipulated, the only issue at trial was the amount of damages.
The jury awarded general damages in the amount of $25,000, past medical expenses in the amount of $19,748, $15,000 for past lost wages, and $50,000 for future lost wages. The jury entered zero awards for the special verdict items of future medical expenses, permanent disability, and loss of health insurability. Kien received an award of $1,500 for loss of consortium.
The Sengsoulies contend on appeal that, except for the award for past medical expenses, all damage awards are too low, and that the jury erred in awarding nothing for future medical expenses, permanent disability, and loss of health insurability.

DISCUSSION OF MENG'S INJURIES
This case was complicated by the fact that the Sengsoulies are natives of Laos and can speak almost no English. At trial their testimony was given through an interpreter.
At Dauterive Hospital Meng was first seen by Dr. Stephen Ritter. He sutured a cut on her forehead and then called in Dr. Harold Hebert, an orthopedic surgeon, to treat her fractured right arm.
Dr. Hebert noted that Meng had abrasions on the side of her face and chest probably due to the seat belt. He proceeded to treat her broken arm. The humerus, the bone that runs from the shoulder to the elbow, was displaced in the middle, or completely broken through, but had not broken through the skin. The fracture was described as a comminuted fracture because there was also a chip broken off the bone.
Dr. Hebert admitted Meng to the hospital for observation, sedated her, and placed her in a hanging arm cast, which is a heavy weighted cast that is put on the arm to pull the arm and make the bone come out straight. Meng was in the hospital for three days.
Dr. Hebert treated Meng for about a month. During this time he tried four different mechanisms: the hanging arm cast, a humeral fracture brace, a humeral fracture brace with an ace bandage and pad, and a coaptation splint. By September 30, 1996, Dr. Hebert had obtained correction of the position of the bones by about 75% but was not able to make any *652 progress toward getting the last part of the correction done. He last saw Meng on October 4.
Meng went to see another orthopedic surgeon, Dr. Michael Heard, on October 10. Dr. Heard explained that treatment of this type of fracture involves a combination of using splints, a plastic brace on the arm, and an arm sling because the location of the broken bone makes it hard to cast. Dr. Heard testified that the goal is to give the arm some support and allow it to heal, but to get the shoulder and elbow moving as soon as possible. Dr. Heard further testified that new bone healing would not take place for at least six to eight weeks. He stated that the bone would be solid clinically after six months, but the gaps would not be filled in for about 18 months. Dr. Heard testified that these kind of fractures rarely go back like a puzzle. The bones are healed in an acceptable position so that they will touch, and new bone will bridge the gaps. A lot of times the bones heal in a bayoneted position, but as long as the patient gets full motion, this does not cause a problem.
Dr. Heard explained that it took Meng's arm longer to heal than the average person. Due to the delayed healing, Meng was not able to move the shoulder and elbow early which caused the joint in the arm to get stiff. There was no dispute that this type of fracture and the process of treating it caused severe pain.
As part of Meng's treatment, Dr. Heard ordered physical therapy to improve the movement in her shoulder and elbow. She started therapy on December 18, 1996, and continued through April 7, 1997. When Meng finished physical therapy, she started a self-exercise program at home.
On her first visit with Dr. Heard, Meng also reported that she was experiencing headaches and her neck and low back hurt. On her last visit with Dr. Heard on March 24, 1998, Meng had no more headaches or neck complaints, but she still had moderate to severe pain in her back that came and went. A CAT scan and MRI revealed that there was a bulge at the L4-5 disc. However, Dr. Heard did not think she would need surgery on her back. Dr. Heard was still treating Meng at the time of trial (April 1998) for her back condition. However, Dr. Heard could never say definitely whether the back condition was related to the accident.

FACTUAL FINDINGS
The appellate court has a constitutional duty to review the facts in civil cases, and it has the right to determine whether the trial court's verdict was clearly wrong based on the evidence. Ambrose v. New Orleans Police Amb. Serv., 93-3099 (La.7/5/94); 639 So.2d 216. Whether or not an injury has occurred is a factual determination. Myers v. Broussard, 96-1634 (La.App. 3 Cir. 5/21/97); 696 So.2d 88. After examining the record we conclude that the jury was manifestly wrong in concluding as a fact that Meng did not suffer any permanent disability.

QUANTUM
We will now discuss the evidence which relates to the damage awards about which Meng and her husband complain.

General Damages
The Sengsoulies claim that the award of $25,000 is too low. The role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact, and the adequacy of the award should be determined by the facts or circumstances particular to the case under consideration. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). An appellate court should rarely disturb an award of general damages since the discretion vested in the trier of fact is great. Id. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of a particular *653 injury to a particular plaintiff under the particular circumstances should the appellate court increase or reduce the award. Id. "The primary considerations in assessing damages are the severity and duration of the injured party's pain and suffering." Iorio v. Grossie, 94-846, p. 8 (La.App. 3 Cir. 10/4/95); 663 So.2d 366, 372.
The jury awarded $25,000 for past, present, and future mental and physical pain and suffering, permanent disfigurement, and loss of enjoyment of life. The jury awarded zero damages for the verdict form item of permanent disability. This translates into a jury factual determination that she suffered no permanent disability.
There is no doubt in this case that Meng suffered a serious fracture which was very painful and required a three-day hospital stay. Dr. Hebert explained that this is a very uncomfortable fracture. In the healing process the arm usually has to be manipulated several times. Since the cast is below the fracture, and there is nothing immobilizing the shoulder, the joint is still mobile. This meant that every time Meng went to the bathroom, took a deep breath, coughed, or did anything to move around, the bone ends moved causing her pain. He stated that this is a fracture that hurts with treatment. It is a serious fracture that will take from six to twelve months to heal.
Dr. Heard agreed with Dr. Hebert's observations but added that the arm would need 18 months for complete healing. Meng's arm was one of those that took longer to heal. As a result of the length of time it took to heal, her joints got stiff.
Meng also testified that her injury limited her ability to do housework, gardening, and sewing like she did before. Although this court may have awarded more to Meng in general damages, we cannot say that the jury abused its discretion in its award of $25,000. Because the general damage award clearly excluded permanent disability, we will not disturb the general damage award. However, we find the jury was clearly wrong in its finding that Meng suffered no permanent disability as the evidence in the record clearly establishes that she did.

Permanent Disability
Both Drs. Hebert and Heard agreed that Meng suffered permanent disability as a result of her broken arm. Her arm is permanently bowed and lacks strength. Dr. Hebert testified that Meng will continue to have problems in the future with her right upper extremity in general including her shoulder, elbow, hand, and wrist. It was his opinion that when she reached maximum medical improvement, probably within six to twelve months from injury, she could expect to continue to suffer limitation of motion, limitation in grip strength, and limitation of use of both the elbow and shoulder. Dr. Heard testified that Meng suffered permanent stiffness in her elbow and permanent weakness in her arm because she did not have normal use of the arm for a long time. There was no evidence disputing the fact that Meng has suffered a permanent disability as a result of the accident. As we will shortly explain, compensation for Meng's disability is accomplished in part by an award for future lost wages. However, a disability is also manifest as a limitation on activities outside the workplace. The jury gave nothing for this loss. This was error. We find that $10,000 is an appropriate award for this damage.

Loss of Consortium
The jury awarded Kien $1,500 for loss of consortium. The Sengsoulies claim that this award was abusively low.
Compensable elements of a claim for loss of consortium of a spouse include loss of love and affection, loss of companionship, loss of material services, loss of support, impairment of sexual relations, loss of aid and assistance, and loss of felicity. Ferrell v. Fireman's Fund Ins. Co., 96-3028 (La.7/1/97); 696 So.2d 569.
The evidence in the record concerning Kien's claim for loss of consortium was *654 sparse. He, too, testified through an interpreter. He testified that when Meng first came home he slept on the floor because if he slept in the bed with her, it would hurt her arm anytime he moved. For the first six to seven months, he had to care for her by helping her shower and feeding her. He also did the cooking. They had help after noon when he went to work. He continues to help her because she cannot do heavy work. We cannot say that the jury abused its discretion in the award for loss of consortium.

Lost Wages
The Sengsoulies claim that the jury's awards for both loss of past wages and loss of future wages were abusively low. Meng was awarded $15,000 for past lost wages and $50,000 for future lost wages.
The burden of proving a loss of income is on the plaintiff. Myers, 696 So.2d 88. "Past lost wages are susceptible of being calculated with mathematical certainty from the proof offered at trial, and thus, such an award is an exception to the much discretion rule." Id. at 97. "However, the jury must have a reasonable basis for exercising its discretion, and the record must provide a factual basis for the award." Id.
The defense introduced a letter from Fabian Tucker, Human Resources Manager at the Martin Mills plant where Meng had worked for 17 years. Tucker verified that Meng was on a medical leave of absence as of her last day of work on September 16, 1996. Dr. Heard did not approve Meng for light duty work until March 24, 1998. Dr. Heard also testified that Meng would not be able to go back to work as a seamstress due to the repetitive nature of the work. She would require training for something that does not require repetitive use of her arm since it was her dominant arm that was injured. However, Tucker's letter further indicated that Meng was laid off on October 6, 1997, as part of a reduction in force. So, the defendants argue that she would have been out of a job anyway as of October 6, 1997.
The Sengsoulies do not dispute that Meng would have been laid off since all the seamstress jobs were eliminated at the plant. Glenn Hebert, a vocational rehabilitation expert, testified about job opportunities available for Meng. He explained that in connection with his work he has monitored the jobs at Martin Mills and that the company was getting rid of the seamstress jobs.
Dr. Floyd Womack, a professor of Economics and Finance at the University of Southwestern Louisiana, testified regarding Meng's wage losses. When questioned what her past wage loss would be if her job was terminated as of October 6, 1997, he testified that it would be about $18,000. Based on this testimony, we do not find the jury's award of $15,000 abusively low.
The jury awarded her $50,000 for future lost wages. These are factors relevant to such an award:
Before plaintiff can recover for future loss of wages, he must prove the loss with reasonable certainty; however, such damages need not be proven with mathematical certainty. Factors to be considered in determining future loss of earnings include age, life expectancy, work life expectancy, investment income factor, productivity increase, prospects for rehabilitation, probable future earning capacity, loss of future earning capacity, loss of earning ability and inflation. [S]ound judicial discretion must be exercised after all proper considerations are weighed.
. . . .
... A relevant factor to consider in determining future earning capacity is what plaintiff may now earn given his resulting condition.

Gauthier v. Kansas City Southern R. Co., 96-529, p. 2 (La.App. 3 Cir. 11/6/96); 682 So.2d 993, 994, writs denied, 96-2918, 96-2932 (La.1/24/97); 686 So.2d 867, 868, (citations omitted) (alteration in original).
*655 Meng testified that most of her friends who had been laid off had been called back to dyeing jobs at Martin Mills. Glenn Hebert agreed, based on Meng's 17 years seniority, that she would have been called back but for her injury. He added that 93% of the people who had worked at Martin Mills were able to secure employment.
The evidence amply supports the finding that Meng's disability prevented her from being called back to work or finding other work. The jury must have reached this conclusion because it found that she was entitled to loss of future wage damages. Based on the evidence in the record, we must agree with Meng that the amount awarded by the jury was abusively low.
One problem that Meng faced that a lot of other workers in the work force did not face is the language barrier. She speaks very little English. Therefore, she cannot have a job where she has to read or write English. She only finished the sixth grade in Laos and has always worked at Martin Mills since moving to New Iberia. Hebert testified that jobs that would fit her skills include a seamstress, a maid at a motel, or a seafood cleaner. There is no evidence to dispute the fact that she cannot physically work as a seamstress anymore. Her disability also limits her ability to clean seafood due to the rapid motion required for this job. She could not do dyeing at Martin Mills because that involves a lot of heavy lifting and a lot of pushing and pulling. Even if she works as a maid, it will have to be on a part-time basis. Hebert testified that she may be able to get seasonal work at the pepper plants.
Hebert realistically did not see Meng getting any employment at all due to her language barrier, inability to read and write, and her disability. However, if she ever could work, he anticipated that it would only be for 1,000 hours a year at a minimum wage of $5.15 to $6.00 an hour.
Dr. Womack calculated Meng's total future wage loss based on her work-life expectancy at $246,903 if she is unable to work at all. He calculated her total future wage loss at $165,990 if she was able to go back to work at $5.50 an hour at 1,000 hours a year. If she was able to go back to work at $6.00 an hour, her total future wage loss was calculated at $102,687.
These calculations were not disputed. Furthermore, Meng had a solid work history of 17 years with the same company. There is no evidence to cast doubt on the fact that she would have continued to work had she not been injured. Therefore, we find that the lowest amount the jury could have awarded for loss of future wages was $102,687.

Future Medical Expenses
The jury did not award Meng anything for future medical expenses. This court discussed the burden of proof regarding future medical expenses in Veazey v. State Farm Mut. Auto Ins., 587 So.2d 5, 8 (La.App. 3 Cir.1991) (citations omitted):
Future medical expenses, like any other damages, must be established with some degree of certainty. The plaintiff must show that, more probably than not, these expenses will be incurred. Awards will not be made in the absence of medical testimony that they are indicated and setting out their probable cost. An award for future medical expenses cannot be based on mere speculation of the jury. Much stronger proof, such as medical testimony of the specific expenses to arise, should be required for such an award.
Dr. Heard was the only person to testify regarding Meng's need for future medical treatment. He stated that there was not a lot that could be done regarding her elbow or arm because it will not get any better. He testified that the low back area is what would need monitoring because of the mild disc bulge. All of his estimates regarding future medical needs were for treatment of her back.
The jury had a reasonable basis for concluding that Meng's back condition was not *656 related to her accident and that therefore, she was not entitled to future medical expenses. Dr. Heard could not clearly relate the back problem to the accident. He said the back condition could be developmental and without prior x-rays, this could not be known. We find no error in the jury's determination that Meng failed to meet her burden of proof regarding future medical expenses.

Health Insurability
There was a space on the jury verdict form for the jury to give an award to Meng for "Loss of health insurability." The jury awarded zero in this category. To establish this loss, the Sengsoulies introduced the testimony of Janet Marler, group health marketing agent for Northwest Mutual Insurance Company. She evaluated the ability of Meng to acquire health insurance since her injury.
Marler testified that Meng was insured under a group health policy with Martin Mills. Marler talked to different insurance companies inquiring whether they would be willing to issue a policy on Meng. She stated that when someone already has a partial or full disability, the insurance companies are unlikely to issue a policy. She stated that she could get a Blue Cross policy with a $1,000 deductible, based on today's premiums, at a cost of $50,000 for the next 20 years. A high risk pool policy would cost $81,714.
This was the only evidence in the record. There was no evidence as to the policy plan that Meng had with Martin Mills. Marler also admitted that her estimates were based on some unknowns. An application on behalf of Meng to an insurance company was never submitted, so it was uncertain if this was even the particular type of disability they would fail to insure.
We have searched for and found no jurisprudence in Louisiana on damages for loss of health insurability. The parties have cited none to us either. In Stanek v. Swierczek, 209 Neb. 357, 363, 307 N.W.2d 807, 811 (1981), the plaintiff argued that "[a] plaintiff whose future expenses for normal health insurance will be increased by reason of tortiously inflicted injury is entitled to recover his added expenses for health insurance from the tortfeasor." The Nebraska Supreme Court would not allow it for several reasons, among which was a reluctance to substitute the cost of a general health policy for proof of past and future medical expenses without proof of any correlation between the cost of the health insurance and medical expenses to be incurred by the plaintiff in the future.
Without reaching the issue of whether this type of damage is available in Louisiana, we find that Meng failed to prove this claim anyway. Like proof of any other future special damage, Meng was required to reasonably establish her claim. The evidence in the record is sparse and too speculative as to the benefits she previously had versus what would be available now. There was no information on what the particular cost to Meng would be given her particular condition. Testimony was based generally on a disability. The jury did not err in failing to award damages for loss of health insurability.
For the reasons set forth in this opinion, the jury's awards for general damages, loss of consortium, and loss of past wages are affirmed. We award damages for permanent disability in the amount of $10,000. We increase the award for future lost wages to $102,687. The jury's denial of damages for future medical expenses is affirmed as is the denial of damages for loss of health insurability.
Costs of this appeal are assessed to Allstate Insurance Company and Oldon Dugas.
AFFIRMED AS AMENDED.
THIBODEAUX, J., concurs in part and dissents in part and assigns reasons.
SAUNDERS, J., concurs in part and dissents in part for the reasons assigned by Judge THIBODEAUX.
*657 THIBODEAUX, J., concurring in part and dissenting in part.
I concur in the majority's conclusions regarding the nature of the damages which should be awarded. However, I disagree with the amount of damages to be awarded for the injuries. Specifically, I disagree with the majority's award of $25,000.00 for past, present and future pain; its award of $10,000.00 for permanent disability and its affirmance of a $1,500.00 award for loss of consortium.
The majority recognizes, and the record supports, that the injury sustained by Ms. Sengsouly was a "serious fracture" which required six to eighteen months to heal. The unrebutted testimony also indicates that Ms. Sengsouly would achieve, at best, a seventy-five percent alignment in her arm as a result of the fracture. Her arm will hurt indefinitely and is at maximum medical improvement. Furthermore, her ability to do even menial tasks was impeded. Because of the severity of this injury, the lowest award which the jury should have rendered is $50,000.00.
Ms. Sengsouly will also experience a permanent lack of movement in her elbow and will experience a loss of strength in her arm as a whole. Because the jury failed to award any compensation for permanent disability, we are not limited on appeal to what would be the lowest or highest amount; rather, we may award what we think is appropriate and just. Thompson v. La. Dept. of Transp. and Dev., 93-1294 (La.App. 3 Cir. 6/29/94); 639 So.2d 864. The majority justifies its award of $10,000.00 because it concludes that Ms. Sengsouly's compensation for permanent disability is accomplished in part by an award for future lost wages. I disagree. Future lost wages and permanent disability are two separate and distinct items of damages. None of the factors articulated by the majority in determining the relevancy of an award of future lost wages are pertinent to permanent disability. To say that permanent disability is in part subsumed by an award for future lost wages or loss of earning capacity is improper. That the majority was influenced by this consideration is reflected in its inappropriately low award of $10,000.00. A more appropriate and just award would be $30,000.00.
Finally, the fact that the evidence for Mr. Sengsouly's loss of consortium was "sparse," that does not depreciate the qualitative aspects of that evidence. The majority adequately sets forth the problems experienced by Mr. Sengsouly as a result of his wife's injuries. I will not repeat them here. The jury clearly abused its discretion in awarding only $1,500.00. The lowest award should have been $10,000.00.
For the foregoing reasons, I concur in part and dissent in part.