863 So.2d 628 (2003)
John THONN, Jr. and his Wife Joyce Thonn
v.
Wayne A. COOK, The Meridian Resource and Exploration Company, Clarendon National Insurance Company and Prudential Insurance Company.
No. 2003-CA-0763.
Court of Appeal of Louisiana, Fourth Circuit.
December 10, 2003.
*632 Craig S. Sossaman, Joseph B. Harvin, Harvin & Sossaman, P.L.C., Metairie, LA, for the Plaintiff/Appellant.
Andre' C. Gaudin, Jocelyn R. Guidry, Burglass & Tankersley, L.L.C., Metairie, LA, for Defendant/Appellee.
(Court composed of Judge TERRI F. LOVE, Judge EDWIN A. LOMBARD, and MOON LANDRIEU, Judge Pro Tempore).
MOON LANDRIEU, Judge Pro Tempore.
Plaintiffs/appellants Joyce and John Thonn, Jr. appeal a judgment signed on June 18, 2002, holding that John Thonn, Jr. had sustained damages arising out of a collision between the vehicle driven by John Thonn, Jr. and that of the defendant/appellee, Wayne A. Cook, consisting of past and future medical expenses of $30,000.00; past and future physical and mental pain and suffering in the amount of $57,000.00; disability/loss of bodily function in the amount of $10,000.00; and property damage in the amount of $5,000.00, totaling $102,000.00. Based on a finding that both drivers were 50% at fault, the trial court held that the defendants/appellees Meridian Resource and Exploration Company ("Meridian"), Wayne Cook's employer, and the Clarendon National Insurance Company ("Clarendon") were liable to pay Mr. Thonn $51,000.00, which figure represents Thonn's damages reduced by the 50% of fault attributable to him, together with interest and costs. Wayne Cook was not cast in judgment.
The Thonns appealed assigning as error the following: (1) the apportioning of 50% of the fault to Thonn; (2) the award of only $67,000.00 in general damages; (3) the award of only $5,000.00 in property damages in the face of uncontradicted evidence that there was $10,444.95 in property damage; (4) the award of only $30,000.00 in past medical expenses in the face of unrefuted evidence of expenses totaling $41,161.49; (5) the failure to award anything for Joyce Thonn's loss of consortium in the face of uncontradicted evidence.
The defendants filed an answer to the appeal, assigning as errors the instruction to the jury that there is a presumption that a left-turning motorist is at fault and *633 that the trial court erred in excluding the testimony of Dr. C. Lynn Skelton. Based on these errors, the defendants request either a de novo review of the record by this court or a remand for a new trial. The brief of the defendants makes no mention of the plaintiffs' assignment of errors concerning property damage or loss of consortium, and only by implication addresses plaintiffs' other items of damages. The defendants' answer to the appeal makes no affirmative claim for damages.
I. FACTS
This case arises out of an automobile accident that occurred in Iberville Parish on March 3, 1999, when the truck driven by the plaintiff-appellant, John Thonn, Jr., collided with the vehicle driven by the defendant, Wayne Cook. The collision occurred on Louisiana Highway 404 when Mr. Thonn attempted to pass Mr. Cook on the left at the same time that Mr. Cook attempted to make a left turn. In this area the highway has two lanes and a 55 mph speed limit. It is an unpopulated area with access roads to oil field pipes and gauges. As a result of the collision, Mr. Thonn's vehicle rolled over more than once, but Mr. Thonn emerged from the vehicle with no broken bones (only a chip at the elbow), no bleeding and no significant internal injuries, with the disputed exception of pericarditis. The plaintiffs filed an original petition on February 23, 2000, requesting damages for past and future medical expenses, past and future general damages, past and future loss of earnings, property damages and loss of consortium. The petition named as defendants Wayne A Cook, Mr. Cook's employer, Meridian, Clarendon for insurance coverage on Meridian and its employee, the aforesaid defendant, Mr. Cook, and Prudential Insurance Company ("Prudential") for uninsured motorist coverage. On September 25, 2001, the plaintiffs filed a supplemental and amending petition, seeking damages from Prudential for its failure to pay medical expenses and property damages.
Mr. Thonn is a commercial fisherman with two boats. He also owns and operates Johnny and Joyce Seafood, a seafood market that also sells sandwiches, po-boys and seafood plates. He was involved in these businesses for many years. His work was very strenuous and involved heavy lifting. At the time of the accident he was sixty-two years old, and at the time of trial he was sixty-five years old.
A jury trial commenced on June 10, 2002. At the close of evidence, plaintiffs' claims against Wayne Cook, individually, were dismissed, reserving all claims against Cook's employer, Meridian, and Meridian's insurer, Clarendon. At that time it was stipulated that Mr. Cook was acting in the course and scope of his employment at the time of the accident. A settlement with Prudential resulted in that entity's dismissal from the litigation shortly prior to trial.
Significantly, Mr. Thonn was awarded nothing for past or future loss of income or future medical expenses and he does not assign either item as error on appeal.
II. ISSUES RAISED BY THE DEFENDANTS-APPELLEES' ANSWER TO THE APPEAL.
A. DID THE TRIAL COURT ERR IN INSTRUCTING THE JURY THAT A LEFT TURNING MOTORIST IS PRESUMED NEGLIGENT?
A left-turning motorist involved in an accident is burdened with a presumption of liability and the motorist must show that he is free from negligence. Ditcharo v. Allstate Ins. Co., 99-1873, p. 4 (La.App. 4 Cir. 11/8/00), 772 So.2d 928, 930; Miller v. Leonard, 588 So.2d 79, 81 (La.1991).
*634 The burden rests heavily on the left-turning motorist to explain how the accident occurred and to show that he is free of negligence. Hughes v. Scottsdale Ins. Co., 35,043 (La.App. 2 Cir. 8/22/01), 793 So.2d 537; Severson v. St. Catherine of Sienna Catholic Church, 97-1026 (La.App. 5 Cir. 2/11/98), 707 So.2d 1026. The cases cited by the appellees in support of the contention that there is no presumption of negligence against the left turning driver ante-date these cases. Ditcharo, Miller, Hughes, and Severson represent the current state of the jurisprudence.
There was no error in the instruction given by the trial judge in the instant case, and, consequently, no merit in the assignment of error raised in the appellees' answer to the appeal.
B. DID THE TRIAL COURT ERR IN EXCLUDING THE TESTIMONY OF DR. C. LYNN SKELTON?
In their answer, the defendants also assigned as error the ruling of the trial court excluding the testimony of Dr. C. Lynn Skelton. Dr. Skelton was listed as a potential witness in defendants' pre-trial order. When the plaintiffs received the appellees' pre-trial submission naming Dr. Skelton as a potential witness, they complained that the defendants failed to properly update previous answers to interrogatories which did not specifically list Dr. Skelton by name. The defendants complain that the disallowing of Dr. Skelton's testimony on this basis was inconsistent because the trial court made the opposite ruling on an analogous attempt by the plaintiffs to introduce certain photographs of the accident scene which the appellees contend were taken at a different point in the road. The issue of the admissibility of the defendants' photographs was argued in a rule hearing held on June 10, 2002:
Plaintiffs' attorney stated:
* * *
As far as my photos, I had listed in my discovery responses that I was obtaining photographs.
In November, October [sic] when former counsel, right before he was fired, I told him, I said, "I've got the photos. I'm going to see you in Dr. Diaz' depo. Let's get together. If you want to look at them, if you want to get copies, whatever."
Shortly after that he [[1]] was fired right after Diaz' deposition I remember. So nobody ever inquired as to the photos again. I told the defendants about two weeks ago about my photos. I said, "You'll want a copy? What do you want?" About ten days ago. And as of Friday out of an abundance of caution I brought them a set of my photos because they had never asked for them.
I would anticipate they are going to object to my photos, too, but it comes I've never seen these. This is taken, as counsel's told me, Sunday, right?
The defense counsel did not contest the above statement made by plaintiffs' counsel. The defendants were aware of the pictures well in advance of trial, but did not request them. Instead defense counsel gave the following response in pertinent part:
I'm not necessarily objecting to the photos, Judge. [Emphasis added.] The question was whether they would be used in opening statement. And I suppose that's fine, but I wanted to be clear that the testimony of the State Trooper puts you at a different place.
*635 Later in the same hearing, defense counsel stated:
Well that's what I'm saying, Judge. I'm content to have him show these pictures [Emphasis added.], but I would like the opportunity to show pictures which in fact truly depict the scene of the accident as measured off by the cop.
Defense counsel objected to what was depicted in the photographs rather than the timeliness of the disclosure of the pictures. Defense counsel stated: "Now, I don't dispute that [plaintiffs'] counsel may have told prior [defense] counsel about their existence." The trial judge ruled that defense counsel at trial could challenge whether the pictures accurately reflected the accident location, but defense counsel never actually objected to the timeliness of the disclosure of the existence of the pictures. Defense counsel did not object on the basis that the plaintiffs failed to properly supplement their discovery requests in accordance with La. C.C.P. art. 1428. An objection pursuant to Article 1428 may not be raised for the first time on appeal.
In support of their argument that it was error for the trial court to refuse to allow the testimony of Dr. Skelton, the defendants contend that at the plaintiffs' video deposition of Dr. Victor Echenique taken for trial purposes on June 5, 2002, only five days before the scheduled trial date of June 10, 2002, Dr. Echenique materially changed his testimony. The defendants contend that it became necessary to introduce the testimony of Dr. Skelton in rebuttal to the new opinion by Dr. Echenique of a diagnosis of pericarditis, which Dr. Echenique related to the accident for the first time in his video deposition. The defendants contend that Dr. Skelton's testimony should be considered to be rebuttal testimony which is not required to be listed in either the pre-trial order or in discovery, citing LeBlanc v. Continental Grain Co., Inc., 95-813 (La.App. 5 Cir. 3/13/96); 672 So.2d 951. However, in that case, the Fifth Circuit stated:
... we take cognizance of the well established legal principle that the trial court has great discretion in controlling the presentation of evidence, including the power to admit or refuse to admit rebuttal evidence. [Emphasis added.]
Id., p. 15, 672 So.2d at 958.
The defendants point to nothing in the record to show that Dr. Echenique had, in fact, changed his testimony. The defendants in their brief refer to a deposition of Dr. Echenique taken for discovery purposes on September 27, 2001. No portion of that deposition appears in the record, it is not on the exhibit list of any party, and it was not proffered by the defendants in whole or in part.
The video deposition of Dr. Echenique was taken on June 5, 2002, for trial purposes. The defendants make the following complaint concerning that deposition in their brief:
During the June 5, 2002, deposition of Dr. Echenique, only five days prior to trial, Dr. Echenique materially changed his testimony.
In reviewing the video deposition, we find no reference to any prior inconsistent statements made by Dr. Echenique. The "prejudice" that defendants allege they suffered by being deprived of Dr. Skelton's testimony, was their inability to impeach Dr. Echenique's allegedly altered testimony. However, as there is no evidence in the record of any change over time in Dr. Echenique's testimony, there is no evidence of any prejudice to the defendants. Any error in the exclusion of Dr. Skelton's testimony was harmless as the defense did not show that they were prejudiced.
*636 We find no abuse of the trial court's discretion in its decision to deny the admission of Dr. Skelton's testimony.
In connection with their June 4, 2002 motion in limine filed a few days before the trial, objecting to Dr. Skelton's testimony at trial, the plaintiffs noted that he was not listed in the defendants' August 18, 2000 answers to the plaintiffs' discovery requests. Approximately a year later the plaintiffs requested that the defendants update their discovery answers. Again the defendants did not list Dr. Skelton as a witness. Annexed to their memorandum in support of their motion in limine, the plaintiffs offered a copy of a letter from defense counsel requesting that Dr. Skelton examine Mr. Thonn. However, when plaintiffs' counsel contacted defense counsel, he was advised by defense counsel that the defendants no longer required an examination by Dr. Skelton. Plaintiffs' counsel noted that the suggestion that Dr. Skelton might testify at trial based on a review of plaintiff's medical records came as a complete surprise. Plaintiffs moved that his testimony be barred. The plaintiffs further argued that had they known that Dr. Skelton was to be called as a witness, they would have taken his deposition. The defendants maintain that they listed Dr. Skelton as a potential witness in their pre-trail submissions, which the plaintiffs aver they did not receive until May 31, 2002, ten days before the trial.
A trial judge has much discretion in imposing sanctions for a party's failure to comply with a discovery order and his choice of sanctions will not be reversed, absent a clear showing that he abused his discretion. Creppel v. Tidewater Marine Service, Inc., 94-0984 (La.App. 4 Cir. 10/13/94), 644 So.2d 1071; Magri v. Westinghouse Electric, Inc., 590 So.2d 830 (La. App. 4 Cir.1991); Fulgham v. An Unknown Police Officer, 480 So.2d 417 (La. App. 4 Cir.1985).
Whether or not to allow the testimony of witnesses who were not identified in response to interrogatories is within the discretion of the trial court. Whether a sanction of exclusion of the witnesses is substantially justified will depend on the circumstances of each individual case. Varnell v. Louisiana Tech. University, 28,266 (La.App. 2 Cir. 4/3/96), 671 So.2d 1238. We find no abuse of the trial court's discretion in excluding the testimony of Dr. Skelton in the present case.
We find no merit in either of the assignments of error raised by the defendants-appellees in their answer to the appeal.
III. ISSUES RAISED BY THE PLAINTIFFS' APPEAL
A. WAS THE DEFENDANTS-APPELLEES' BRIEF IN PROPER FORM?
The plaintiff's complain that:
Defendants'/Appellees' Statement of the Case and Summary of the Argument are not supported by any references to the Trial Record herein and accordingly should be disregarded in their entirety.
We find more than adequate references to the record in the defendants' brief. The citations to the record in support of an argument on a specification of error referred to in the Uniform Rules Courts of Appeal, rule 2-12.4 do not have to be placed in a specific portion of the brief, as long as citations to the record are included in support of the actual "argument," as provided in the instant case.
B. DID THE JURY ERR IN AWARDING PLAINTIFF ONLY $5,000.00 IN PROPERTY DAMAGES?
The plaintiffs contend that they presented uncontradicted evidence of *637 property damage in the amount of $10,444.95, but the jury erroneously awarded them only $5,000.00.
Mr. Thonn testified that he claimed $5,250.00 for a thermal king unit that was on his truck. The destruction of the unit was confirmed by the investigating officer and by pictorial evidence as well. Although his truck was a total loss, Mr. Thonn only asserted a claim for the $250.00 deductible because he was satisfied with the balance paid by insurance. He also testified that he lost a large Hercules cooler that had cost him $4,000.00 before tax. Defense counsel made no objection to these figures which total $9,500.00.
Mr. Thonn also testified that he lost "a half inch drill and a seven and a quarter [sic] skill saw, a tape measure, phone and a bunch of ... tapes that we had acquired from Branson." He went to Sears to get prices on comparables. At this point, defense counsel entered the following objection:
Okay. Just note our objection. This is not a big deal. It's not big numbers I'm concerned about. But what I have here is an itemizing as listing of prices that Mr. Thonn says he went and got from Sears and et cetera. I don't know how old any of this equipment was and when it was lost. I don't know if there is any depreciation as to the value of its claim. This document is pure hearsay as to those actual expenses, those actual, I guess, replacement costs.
It's not a big deal, Judge. It's not a whole lot of money, but I feel constrained to object.
Mr. Thonn testified that all of his items of property damage totaled $10,444.95. Therefore, the only items the value of which defense counsel questioned were valued by Mr. Thonn at only $944.95 ($10,444.95 minus the $9,500.00 in unchallenged items). Significantly, defense counsel challenged only the value of these items, not the fact that the items were lost in the wreck. When plaintiffs' counsel offered into evidence as an exhibit in connection with Mr. Thonn's testimony, Mr. Thonn's list and estimates of damages, including his handwritten list of the prices he noted at Sears, defense counsel stated that he had no objection. Furthermore, when given the opportunity to do so, defense counsel did not cross-examine Mr. Thonn concerning these items of damage. In the absence of countervailing evidence or an attempt to impeach the plaintiff's testimony, the evidence presented by the plaintiff adequately proved his claim for property damage. The award for property damages should be increased to $10,444.95.
The items of personal property claimed by Mr. Thonn constitute special damages as opposed to general damages. In Wainwright v. Fontenot, 00-0492, p. 5-6 (La.10/17/00), 774 So.2d 70, 74, the Louisiana Supreme Court stated:
Special damages are those which either must be specially pled or have a `ready market value,' i.e., the amount of the damages supposedly can be determined with relative certainty." [Frank L. Maraist & Thomas C. Galligan, Jr., LOUISIANA TORT LAW § 7-1 (Michie 1996)] § 7-2 (footnotes omitted). Included under the heading of special damages are the plaintiff's medical expenses incurred as a result of the tort. 1 DAMAGES IN TORT ACTIONS § 3.02[2][c][i] [XXXX-XXXX La. 6] Matthew Bender 2000). On the other hand, "[g]eneral damages are those which are inherently speculative in nature and cannot be fixed with mathematical certainty. These include pain and suffering[.]" Maraist & Galligan, supra, § 7-2.
See also Etheredge v. St. Paul Mercury Ins. Co., 35,832, p. 3-4 (La.App. 2 Cir. 4/3/02), 814 So.2d 119, 122.
*638 The jury is not afforded the same broad latitude of discretion in the fixing of special damages as it is in matters of general damages and the allocation of comparative fault. Kelty v. Brumfield, 96-0869 (La.App. 4 Cir. 3/12/97), 691 So.2d 242; Vines v. Wood, 34,555 (La.App. 2 Cir. 4/4/01), 785 So.2d 126.
While the jury was clearly wrong and committed manifest error concerning the property damage award to Mr. Thonn, it was not the type of error that would interdict the entire fact finding process and warrant a de novo review of other findings made below. This is not the type of error that would undermine one of the foundations upon which the decision is based, such as an error as to causation.
In Mart v. Hill, 505 So.2d 1120, 1128 (La.1987), the Louisiana Supreme Court stated:
At the outset, we note that this case is not fully governed by the principles set forth in Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977). In Coco, the issue before us was the court of appeal's substantial reduction of a jury award. There was no issue, as there is in this case, as to whether subsequent medical intervention and the resultant disability suffered by the plaintiff were related to the tortious conduct of the defendant. We first noted in Coco that the trier of fact has "much discretion" in awarding damages. We ultimately held that when an appellate court finds that the lower court abused this discretion, the appellate court may only raise or lower the award to the highest (or lowest) point which is reasonably within the discretion of that court. The Coco principle of appellate review applies when an appellant questions the adequacy of a monetary award in a case which is otherwise uncomplicated by factual errors relating to the cause or duration of the plaintiff's disability.

In Taylor v. State Farm Mutual Automobile Ins. Co., 01-0317 (La.App. 3 Cir. 10/3/01), 796 So.2d 802, when the court found manifest error in the amount of the general damages and loss of consortium awards, the court conducted a de novo review of the record concerning those items, but reviewed the apportionment of fault and certain medical expenses pursuant to the manifest error standard of review.
In the instant case, the increase in the special damage award does not warrant a de novo review of the remainder of the damage awards.
C. WAS THE JURY'S FAILURE TO AWARD MRS. THONN ANYTHING FOR LOSS OF CONSORTIUM ERROR?
Plaintiffs complain of the failure of the jury to award the plaintiffs any damages for Mrs. Thonn's loss of consortium. Mrs. Thonn testified that prior to the accident when they went to a dance, they danced every dance. "Now, if we dance one or two it's plenty."
She also testified that:
I used to love to walk. We can't walk because he's [Mr. Thonn] limited in his ability to walk very far.
Plaintiffs' attorney elicited more testimony from her related to loss of consortium:
Q. Has that changed at all as a result of the accident.
A. Yes.
Q. How?
A. I mean we have a riding lawnmower now. And ifI have an edger that I edge the edge of the cement on the grass with. He does the edging by the fence, but it's very hard for him. He *639 has to stop and then he has to start again.
Q. Did you buydid you specifically buy the lawnmower after this accident occurred because of his limitations?
A. We bought a new lawnmower. I hadwe had a riding lawnmowerBut, I mean he didn'tit wasn't the same type.
Mrs. Thonn concluded her direct examination as follows:
Q. Were there any changes in your sexual relationship with your husband as result of this accident?
A. Yes, in frequency.
Q. Frequency?
A. Right.
Q. With all that you and Mr. Thonn have been through, as a result of this accident, has it in anyway changed your love for your husband?
A. No. [Emphasis added.]
Defense counsel did not ask Mrs. Thonn any questions on cross-examination related to the loss of consortium issue.
On direct, Mr. Thonn testified that he could no longer sweep or mop because to do so hurt his back. When asked about yard work, he testified that: Well, I still cut my grass because I have a riding lawnmower. But when you're finished cutting the grass you got to go around and weed and edge and stuff. And I still try to do it, but I'll do it for ten, fifteen minutes and then I got to quit. My back is killing me to weed edge.
Mr. Thonn testified that instead of having sex with his wife two or three times a week as he did prior to the accident, after the accident, his back hurts so much that sometimes he may wait for two weeks.
On cross-examination, defense counsel asked Mr. Thonn no questions related to loss of consortium. The defendants' brief on appeal offers no response to the plaintiffs' argument on the loss of consortium issue.
It was error for the jury to award Mrs. Thonn nothing for loss of consortium. In Watson v. Brazeel, 36,499 (La.App. 2 Cir. 12/18/02), 833 So.2d 1276, 1281, writ den. 03-0217 (La.4/4/03), 840 So.2d 1215, the Second Circuit stated:
Loss of consortium claims generally have the following seven items: (1) loss of love and affection; (2) loss of society and companionship; (3) impairment of sexual relations; (4) loss of performance of material services; (5) loss of financial support; (6) loss of aid and assistance; and (7) loss of fidelity. Campbell v. Webster Parish Police Jury, 36,391, 36,392 (La.App. 2d Cir. 09/18/02), 828 So.2d 170.
In the instant case, plaintiffs offered uncontradicted evidence of items # 2, 3 and 4, but there is no claim for loss of financial support (# 3 above), no evidence concerning loss of aid and assistance (item # 6) not included in item # 4, and no evidence of loss of fidelity (item # 7) or loss of love and affection (item # 1).
When a claim for loss of consortium is found to be excessive, this Court is limited to adjusting that award to the highest that could be awarded by a reasonable fact finder. See Holloway v. Midland Risk Ins. Co., 36,262 (La.App. 2 Cir. 10/30/02), 832 So.2d 1004, writ den. 02-3247 (La.3/28/03), 840 So.2d 571. In that case, the Second Circuit stated:
A claim for loss of consortium includes the loss of love and affection, companionship and services. The plaintiff has the burden of proving a definite loss. Quinn v. Wal-Mart Stores, Inc., 34,280 (La.App.2d Cir.12/6/00), 774 So.2d 1093. Here, Nancy Holloway testified that she was expecting a baby when her husband *640 was injured. Nancy stated that while Donnie was recovering, she drove him to his doctor's appointments and helped him to shave, get dressed and cut his food. After the surgeries, Holloway was unable to help his wife with the household duties, including laundry and mowing the lawn. Nancy acknowledged that her husband's injury did not cause long-term damage to the marriage. Don Holloway testified that his ordeal had strengthened the relationship with his wife.
Based upon the testimony presented, we must conclude that the jury's award of $25,000 for loss of consortium is excessive. Considering the evidence of the effect of Holloway's injury on the relationship with his wife, we find that an award of $10,000 is the highest amount reasonably within the discretion of the factfinder under the circumstances of this case. The judgment shall be amended accordingly.
Id., p. 17, 832 So.2d at 1015.
When the award for loss of consortium is found to be inadequate, this Court is limited to adjusting that award to the lowest that could be awarded by a reasonable fact finder. See Roberts v. State, 2000-778 (La.App. 3 Cir. 11/2/00), 776 So.2d 519.
The fact finder has much discretion in the assessment of general damages, including damages for loss of consortium. La. C.C. art. 2324.1; Holloway, supra; Etheredge v. St. Paul Mercury Ins. Co., 35,832 (La.App. 2 Cir. 4/3/02), 814 So.2d 119; Bell v. USAA Cas. Ins. Co., 30,172 (La.App. 2 Cir. 1/21/98), 707 So.2d 102. Not every physical injury will result in a loss of consortium or other general damages. Etheredge, supra; Bell v. USAA Cas. Ins. Co., supra; O'Neal v. Scott, 34,276 (La.App. 2 Cir. 12/20/00), 775 So.2d 1155. The operative question is whether the fact finder abused its great discretion in finding that the plaintiff failed to prove compensable loss of consortium. Etheredge, supra; Wainwright v. Fontenot, supra. In Etheredge the appellate court found no error in the failure to make any award for loss of consortium:
... The plaintiffs both testified that after the accident, their marital relations were temporarily curtailed and their recreational activities impaired. However, there was no showing of loss of affection, society or companionship, financial support or fidelity. On this record, we cannot say the City Court abused its vast discretion in implicitly rejecting the claim for loss of consortium. Although comparison to other cases is not persuasive, we note that Johnny's physical injuries were not as severe as those sustained by the plaintiffs in Bell and O'Neal, yet those plaintiffs also sustained no compensable loss of consortium.
Id., p. 6, 814 So.2d at 123.
To be compensable, it is not necessary that a loss of consortium claim include damages from each category. Gunn v. Robertson, 01-347 (La.App. 5 Cir. 11/14/01), 801 So.2d 555, 565, writ den. 02-0170 and 02-0176 (La.3/22/02), 811 So.2d 942; Seagers v. Pailet, 95-52 (La.App. 5 Cir. 5/10/95), 656 So.2d 700.
However, the facts in the instant case are closer to those found in Taylor v. State Farm Mut. Auto. Ins. Co., 01-0317 (La. App. 3 Cir. 10/3/01), 796 So.2d 802. In Taylor, the Third Circuit explained that:
Mrs. Taylor's testimony established a significant degree of loss of society, sex, service, and support resulting from the effects of Mr. Taylor's injury. She testified as a result of the accident, Mr. Taylor has become more irritable and their relationship has not been the same.

*641 Additionally, prior to the accident, he was able to help around the home by mowing the lawn and taking care of the trash. Because of pain, Mr. Taylor is no longer able to perform these duties leaving Mrs. Taylor responsible.
We find that the jury's failure to award damages for loss of consortium manifestly erroneous and an abuse of discretion. After a de novo review considering the nature of Mr. Taylor's injuries and the impact the injuries have had on his relationship with Mrs. Taylor, we find the amount of $5,000 to be appropriate subject to reduction in accordance with the trial court's apportionment of fault.
Id., p. 10, 796 So.2d at 809.
In Sengsouly v. Allstate Ins. Co., 99-22, (La.App. 3 Cir. 6/9/99), 744 So.2d 649, the appellate court found that a loss of consortium award of only $1,500.00 was not abusively low:
The evidence in the record concerning Kien's claim for loss of consortium was sparse. He, too, testified through an interpreter. He testified that when Meng first came home he slept on the floor because if he slept in the bed with her, it would hurt her arm anytime he moved. For the first six to seven months, he had to care for her by helping her shower and feeding her. He also did the cooking. They had help after noon when he went to work. He continues to help her because she cannot do heavy work. We cannot say that the jury abused its discretion in the award for loss of consortium.
Id., p. 8, 744 So.2d at 653-654.
The brief references in the record to consortium issues, previously quoted in the instant case, do not establish a very substantial claim. The lowest amount a reasonable fact finder could have awarded is $2,500.00 as in Roberts v. State, 00-778 (La.App. 3 Cir. 11/2/00), 776 So.2d 519[2], where the Third Circuit explained that:
Mrs. Roberts appeals the jury's failure to award her damages for her loss of consortium claim. She testified regarding the effect of the accident and Mr. Roberts' injuries on their marriage. She testified that Mr. Roberts became depressed because he could not work after his accident. This was corroborated by Dr. Weiss. Mrs. Roberts did not work prior to Mr. Roberts' injury. Because Mr. Roberts' injury prevented him from returning to work, she had to go to work. This caused Mr. Roberts much concern and placed a great strain on their relationship. Their physical relationship was affected as a result of medication that caused some impotency problems for Mr. Roberts.
The State argues that the Roberts relationship was not as good as they claim because approximately three years before Mr. Roberts' injury, Mr. Roberts filed for a separation. The Roberts testified that the separation lasted only two days and that their relationship thereafter was a good, loving relationship. However, due to the stress and depression caused by Mr. Roberts' injuries, they separated twice after the accident.
The compensable elements of damage in a loss of consortium claim are loss of society, sex, service, and support. "Society" is broader than loss of sexual *642 relations. It includes general love, companionship, and affection that the spouse loses as a result of the injury. "Support" is the lost family income that would go to support the uninjured spouse. "Service" is the uncompensated work around the house or educational help with the children which will, as a result of the injury, have to be obtained from another source and at some price.[[3]]

Broussard v. Romero, 96-973, p. 12 (La. App. 3 Cir. 2/26/97); 691 So.2d 1265, 1273, writ denied, 97-670 (La.4/25/97); 692 So.2d 1092, quoting Rowe v. State Farm Mut. Auto. Ins. Co., 95-669, p. 25 (La.App. 3 Cir. 3/6/96); 670 So.2d 718, 732, writ denied, 96-824 (La.5/17/96); 673 So.2d 611.
We find the jury's failure to award Mrs. Roberts damages for loss of consortium to be an abuse of discretion. Considering the nature of Mr. Roberts' injuries, the impact of those injuries on his relationship with Mrs. Roberts, and the duration thereof, we find the amount of $2,500.00 to be the lowest amount that the jury could have reasonably awarded.
Id., p. 12-13, 776 So.2d at 526-527.
Accordingly, the judgment below should be amended to award Mrs. Thonn $2,500.00 for loss of consortium.
D. DID THE JURY ERR IN ALLOCATING 50% OF THE FAULT TO THE PLAINTIFF, MR. THONN?
Plaintiffs contend that the jury erred in apportioning 50% of the fault to the plaintiff, Mr. Thonn.
In Duncan v. Kansas City Southern Railway Co., 00-0066, p. 10-11 (La.10/30/00); 773 So.2d 670, 680-681, the Louisiana Supreme Court has set forth the standard for reviewing comparative fault determinations:
This Court has previously addressed the allocation of fault and the standard of review to be applied by appellate courts reviewing such determinations. Finding the same considerations applicable to the fault allocation process as are applied in quantum assessments, we concluded "the trier of fact is owed some deference in allocating fault" since the finding of percentages of fault is also a factual determination. Clement v. Frey, 95-1119 (La.1/16/96); 666 So.2d 607, 609, 610. As with other factual determinations, the trier of fact is vested with much discretion in its allocation of fault. Id. Therefore, an appellate court should only disturb the trier of fact's allocation of fault when it is clearly wrong or manifestly erroneous. Only after making a determination that the trier of fact's apportionment of fault is clearly wrong can an appellate court disturb the award, and then only to the extent of lowering it or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion. Clement, 666 So.2d at 611; Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La. 1977).
The appellate court's determination of whether the trial court was clearly wrong in its allocation of fault is guided by the factors set forth in Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967, 974 (La.1985). In Watson, we said "various factors may influence the degree of fault assigned, including:
(1)[W]hether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk *643 was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.["]

Watson, 469 So.2d at 974. These same factors guide the appellate court's determination as to the highest or lowest percentage of fault that could reasonably be assessed. Clement, 666 So.2d at 611.
The very wide latitude afforded the fact finder in allocating comparative fault was well described by this court in Riley v. Reliance Ins. Co., 97-0445 (La.App. 4 Cir. 11/19/97), 703 So.2d 158:
Thus, Clement tells us that the allocation of fault is not an exact science, or the search for one precise ratio. Rather, it is an acceptable range and any allocation by the jury within that range cannot be "clearly wrong." In Clement, the Supreme Court held that any allocation of fault falling between a ratio of 50/50 and 75/25 would be reasonable. This very broad range is illustrative of the analogy referred to in the passage quoted above from Clement, comparing fault and quantum determinations. Mindful that in quantum determinations, Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), affords the factfinder "great, even vast" discretion, the Clement analogy mandates this Court to afford considerable latitude to the trial court in matters of fault allocation.
Id., p. 6-7, 703 So.2d at 163.
Based on the foregoing, the plaintiffs have a heavy burden to overcome the allocation of fault made below.
The plaintiffs argue that no fault should be allocated to Mr. Thonn based on the presumption of negligence working against Mr. Cook as the left-turning motorist, coupled with plaintiffs' assertions that Mr. Cook's testimony concerning if and when he signaled his left turn was unpersuasive and that Mr. Cook failed to see Mr. Thonn's vehicle in the left lane, which he should have seen. Plaintiffs are correct as to his first contention, i.e., that Mr. Cook as the left-turning motorist is presumed to be negligent. However, we cannot say that, based on a review of the record as a whole, that a reasonable fact finder could not conclude that Mr. Thonn was contributorily negligent in driving too fast. As the jury implicitly made that reasonable conclusion, it was also reasonable to assign fault to Mr. Thonn just as was the case in Guillory v. Insurance Co. of North America, 96-1084 (La.4/8/97), 675 So.2d 1095, where the Louisiana Supreme Court reversed the appellate court saying:
The court of appeal asserted that "Guillory's duty not to exceed the speed limit did not encompass the risk that a driver executing an improper lane change would crush his vehicle." We disagree. Scope of duty is determined by the case of association between the duty owed and the risk encountered. Lejeune v. *644 Rayne Branch Hospital, 556 So.2d 559 (La.1990). A driver, in operating his vehicle above the lawful speed, exposes himself to a risk that another driver will make improper decisions based on miscalculations of plaintiff's speed. In this case, defendant's improper decision to change lanes was based on such a miscalculation. Defendant misjudged the distance plaintiff's vehicle would cover when determined that he had ample time and space to safely change lanes. Under the circumstances, the duty not to speed encompassed the risk that the failure to adhere to the speed limit coincident with another's unsafe move would contribute to the occurrence of an accident that otherwise might not have taken place.
Id., p. 11-12, 692 So.2d at 1035.
The jury in this case implicitly found, based on Mr. Cook's testimony which they were entitled to believe, that at the rate Mr. Thonn closed on Mr. Cook's vehicle, he must have been traveling well in excess of the speed limit, causing Mr. Cook to miscalculate the amount of time in which he had to safely execute his left turn in a manner analogous to that of the defendant driver in Guillory, supra.
A reasonable fact finder could also infer that a contributing cause of the collision was Mr. Thonn's lack of control over his vehicle in making the passing maneuver. Moreover, a reasonable fact finder could find that Mr. Cook employed his turn signal in a timely manner.[4] That is a credibility call coupled with reasonable inferences to be drawn from such a credibility call. The fact that the fact finder could choose to disbelieve Mr. Cook or draw other reasonable inferences from his testimony less favorable to his case, does not detract from the jury's implicit decision not to do so in the instant case. Where two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 883 (La.1993). The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. Id. at 882. The reviewing court may not disturb reasonable evaluations of credibility and reasonable inferences of fact when viewed in light of the record in its entirety even though it feels its evaluations are more reasonable. Id. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in testimony. Id.
Additionally, while this Court subscribes to the view discussed earlier in this opinion that there is a presumption of negligence against the left-turning driver involved, where the collision with the left turning motorist involves a passing motorist, the courts of this state likewise recognize that the passing motorist is also charged with an exceptional duty of care. The driver of an overtaking or passing vehicle has the duty to ascertain before attempting to pass a preceding vehicle that from all the circumstances of traffic, lay of the land, and conditions of the roadway, the passing can be completed with safety. Palmieri v. Frierson, 288 So.2d 620 (La. 1974); Barrociere v. Batiste, 99-1800 (La. App. 4 Cir. 2/2/00), 752 So.2d 324; Taylor *645 v. State Farm Mutual Automobile Insurance Co., 01-0317 (La.App.10/3/01), 796 So.2d 802.
In the instant case, Mr. Cook's version of the accident is not so internally inconsistent or unbelievable that we can say that the jury was manifestly erroneous or clearly wrong in choosing to credit Mr. Cook's version in whole or in part. This is a credibility call the jury is entitled to make with the advantage of being able to observe the demeanor of the live witnesses.
While the plaintiffs place emphasis on the deposition testimony of the investigating officer,[5] Trooper Mark Whitmore, a careful reading of his testimony reveals that the only fact to which he testifies with any certainty is that the accident occurred in the left passing lane, a fact disputed by no one. The law places a high duty of care on the plaintiff as well as the defendant. While Trooper Whitmore testified that although he didn't recall doing so, he was certain that he would have asked Mr. Cook if he had his blinker on, but he did not state with equal certainty that he would have made a notation of that fact in his accident report. There is, in fact, no mention in the accident report of whether Mr. Cook reported anything concerning his turn signal and Trooper Whitmore had no independent recollection of what Mr. Cook may have told him in this regard. When this is coupled with the fact that he was certain that he spoke to the plaintiff about the accident, but also failed to make any note of it in his report, a reasonable fact finder could easily decide not to afford much evidentiary weight to areas in which Trooper Whitmore's report was silent. One can hardly say that his testimony was so conclusive that no reasonable fact finder could believe Mr. Cook's statement, even if equivocal, that he had his left turn signal on.
The testimony of the witnesses is not so contradicted by objective or documentary evidence and is not so internally inconsistent that a reasonable fact finder is compelled to disbelieve a particular witness or the reasonable inferences to be drawn from a particular witness' testimony. Therefore, the record as a whole permits the jury to reach any number of reasonable conclusions concerning fault and we, therefore, cannot say that the 50/50 allocation of fault as determined by the jury is beyond the jury's broad discretion.
Accordingly, we find no merit in the plaintiffs' assignment of error regarding the allocation of fault.
E. DID THE JURY ERR IN AWARDING THE PLAINTIFF ONLY $67,000.00 IN GENERAL DAMAGES.
Mr. Thonn argues that it was error for the jury to award him only $67,000.00 for general damages. The plaintiff bears a heavy burden at the appellate level when challenging an award of general damages in view of the "great, even vast discretion" afforded the fact finder in making such awards. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). The Louisiana Supreme Court stated:
[T]he role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate *646 award, but rather to review the exercise of discretion by the trier of fact. Each case is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration.
In Reck v. Stevens, 373 So.2d 498 (La. 1979), this court disapproved the appellate court's simply reviewing the medical evidence and then concluding that the award for those injuries was excessive, without taking into consideration the particular effect of the particular injuries on the particular plaintiff. This court further disapproved of the use of a scale of prior awards in cases with generically similar medical injuries to determine whether the particular trier of fact abused its discretion in the awards to the particular plaintiff under the facts and circumstances peculiar to the particular case. The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. [Citations omitted.] Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. [Citations omitted.]
.... [T]he discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Id., 623 So.2d at 1260-1261.
Following further instructions from Youn, we cannot say that the jury award in the instant case was so low as to be the obvious result of passion and prejudice and this is not one of those exceptional cases where the award is so gross as to be contrary to right reason. Id., 623 So.2d at 1261.
Mr. Thonn argues that as a result of the accident he suffered three herniated discs of the neck; two bulging discs of the lower spine; a 15-20% functional disability; ongoing back pain with occasional burning in the right thigh, most likely caused by the bulging and/or protruding discs in his lower back; and pericarditis resulting in chest pain, difficulty in breathing deeply, irregular heart beats, chest wall tenderness, shoulder pain and arm pain for 17 months until his condition was diagnosed and brought under control with medication which he must continue to take. He also suffered from a cerebral concussion, a transverse mass in his left elbow, numerous contusions and abrasions, and mental anguish.
Mr. Thonn testified that immediately after the accident he said to himself: "I'm all right. I got to get out of here." He testified that:
I struck everything. My chest had hit the steering wheel because when the seatwhen the back of the captain's chair broke and it pulled me back, when I pulled back the next thing I was still tumbling. I hit my chest. I hit my head several times. The seatbelt had tore up my arm.
He testified that when he got out of his wrecked vehicle, he talked to Mr. Cook. About ten minutes later a friend of his drove by. He asked her to call either the *647 police or 911, but he also told her that he was all right. At this time the only thing that was bothering him was his left shoulder "and my arm was tore up pretty good." He didn't have any bleeding. About ten minutes later he started feeling jumpy and shaky.
When an emergency vehicle arrived, Mr. Thonn refused to go to the hospital in it, "because I didn't feel that I was that hurt, that seriously hurt." He allowed them to check his vital signs, but he didn't want to upset his wife by having her get a call that he was in a hospital. He told the emergency people that he would go to the hospital after he got home to his wife. By the time he got home, everything was hurting. His stomach was churning and he had a headache. His wife drove him to the Methodist Hospital where X-rays were done of his head, chest, and elbow, along with a head scan. He was informed that he had a chip in his elbow and that the muscle tissue and tendons were torn in his left arm. A hard splint was placed on his arm, and he was told to see a "bone doctor,"[6] which he did on the following day. He was told not to use his arm for a couple of weeks, although an X-ray showed that it was not broken and the "bone doctor" removed the splint. He was given some Naprosyn[7] and sent home. Five or six days later bruises started to develop. Mr. Tonn identified pictures showing the marks where the steering wheel hit him across the chest, as well as the lump in his arm where the seat belt constricted his muscle mass.
In reviewing Mr. Thonn's medical records, Dr. Diaz noted that the first mention of ongoing low back pain did not appear until eight months after the accident. Dr. Diaz testified that more probably than not Mr. Thonn's neck and back problems were caused or aggravated by the accident. When asked how he came to that conclusion, he responded: "I have to depend mostly on Mr. Thonn telling me that." Dr. Diaz was then asked:
Q.... In this case though, you did tell us, didn't you, that the diagnostic studies revealed to you conditions which you would expect to see in a man sixty years old, who had been a hard worker?
A. Yes.
Q. So the diagnostic studies didn't allow you standing alone, to make a connection back to March 3rd of '99?
A. No....
* * *
Q. Just so that I'm clear, there's nothing from your examination of him when you first saw him in May 2000 or through the present date, or from the diagnostic studies that you've been able to look at or interpret, that allows you to make a causal link?
A. That's correct.
Q. It's just the history that he told you?
A. Yes.
Q. And if the history is wrong, then your causation opinion is wrong, correct?
A. Yes, it can change.
Dr. Diaz testified that the plaintiff did not report any complaints to him concerning his elbow, headaches or dizziness. However, as Mr. Thonn came to consult him concerning his back and not those other complaints, Dr. Diaz felt that Mr. Thonn's failure to mention those other complaints was not significant. Dr. Diaz acknowledged that Mr. Thonn had checked off that portion on his form indicating that he had not been declared to be disabled by *648 any other physician. Mr. Thonn reported on the same form that he continued to work. Dr. Diaz testified that when he examined Mr. Thonn's neck on May 16, 2000:
He had a good range of motion of the neck. He had some complaints of tenderness when I pressed on either side of the neck. The test to check for strength and feeling in the arms which correspond to the neck were normal, and the reflexes that also are checked in the arms and correspond to problems in the neck or can correspond to problems in the neck, were normal.
Dr. Diaz then testified that he found no objective findings of injury to Mr. Thonn's neck. Dr. Diaz further testified that the MRI findings were consistent with someone Mr. Thonn's age. It was Dr. Diaz's opinion that if the first complaint of neck pain following the accident was that given to Dr. Vogt on November 5, 1999, then Dr. Diaz would not relate the neck pain to the accident. He also admitted that it was possible for someone with the preexisting degenerative conditions that Mr. Thonn has in his neck, to aggravate those problems because of the nature of his work.
Dr. Diaz said the same things about Mr. Thonn's low back pain. His range of motion was normal. Objectively, he found only degenerative changes in his lower back, which could be aggravated by his work. When he saw Mr. Thonn in May of 2000, he asked that he return in three weeks, but he did not return until March of the following year when he reported that his neck was much better. At the same time he reported that his back continued to cause him major problems. Thereafter, he saw Mr. Thonn on several occasions up until April 24, 2001 when Dr. Diaz told him to return in about four weeks. However, Mr. Thonn did not return until October when he was told to return again in six weeks. However, he did not return until May 28, 2002. In spite of Mr. Thonn's continued complaints of back pain, Dr. Diaz did not recommend surgery for either his neck or his back. He recommended that Mr. Thonn alter his lifestyle. He concluded his testimony on redirect examination by opining that he thought that Mr. Thonn's complaints were genuine.
Dr. Claude S. Williams, an orthopedic surgeon, was called by the defense to testify. He had seen Mr. Thonn on September 19, 2001, for an independent medical examination, i.e., an examination for the purpose of rendering an opinion and not treatment. Mr. Thonn complained to him of lower back and neck pain.
In reviewing his records, Dr. Williams noted that Mr. Thonn was 5'10" tall, weighed 260 pounds, and had a fifty-one inch waist. He could move his neck in all planes of motion with no muscle spasms or tenderness of nerves. He had a slight limitation of neck rotation. He could bend over and touch the lower leg ankle level and could walk on his heels and toes without any muscle spasm in his back and with very little discomfort. He demonstrated no sciatic nerve pain when performing the straight leg-raising maneuver. There was no indication of nerve root irritation or nerve root problems in Mr. Thonn's lower back. Mr. Thonn reported no pains in his right thigh. His review of Mr. Thonn's diagnostic studies previously conducted by other physicians showed that:
There was an MRI of the lumbar spine from November 15, 1999 that showed normal alignment of the vertebral bodies. The quality was somewhat granular. There was decreased hydration of the disc at L3-4, L4-5, and L5-S1 with no herniation of the disc and no compression of the nerves.

*649 The MRI of the lumbar spine [of] April 16, 2001 showed, again, disc degeneration at L3-4, L4-5 and L5-S1 with no disc herniation or compression of the nerves.
There was another MRI [on] March 26, 2001 of the lumbar spine that had poor contrast. There were degenerative changes in the disc at L3-4, L4-5 and L5-S1.
Dr. Williams said that the degenerative changes could be attributed to the ordinary aging process, but that it could be accentuated by trauma. Such findings were unexceptional in someone of Mr. Thonn's age and work experience.
The only objective findings Dr. Williams noted was some limitation of neck rotation. He found no indication of any need for low back or neck surgery. He opined that any symptoms of neck or low back pain caused by Mr. Thonn's accident should manifest themselves within a few days after the accident, not a few months.
Dr. James Keith Baker was qualified as an orthopedic surgeon. He first saw Mr. Thonn on March 4, 1999. Mr. Thonn complained of left elbow pain following an automobile accident the day before. Dr. Baker testified that if Mr. Thonn had complained of any lower back pain or neck pain, he would have noted it. Dr. Baker detected an abrasion of the inside portion of Mr. Thonn's elbow, minimal tenderness on the outside of the elbow, and full range of motion of the elbow. His review of Mr. Thonn's X-rays revealed no broken bones or fractures. He instructed Mr. Thonn to return to the clinic as needed: "I felt that this would probably resolve on its own."
Mr. Thonn returned to Dr. Baker a week later, March 11, 1999, with continued elbow pain, swelling and some bruising. He also complained of pain in his left index finger. Again, Mr. Thonn made no mention of back or neck pain.
Dr. Baker noted no deformity in the affected index finger, but Mr. Thonn's flexion of the finger was limited by pain. Mr. Thonn continued to have full elbow motion, but experienced pain when fully extended. An X-ray of the left index finger made that day showed neither fracture nor dislocation. Dr. Baker concluded that Mr. Thonn had bruised his left index finger and elbow and that he had strained his biceps tendon in the left elbow. He felt that there was a possibility that Mr. Thonn also had some clotting in one of the skin veins. Dr. Baker recommended that he begin treatment with an anti-inflammatory medication and that he limit his activities until his pain subsided. Dr. Baker scheduled no follow-up appointment and did not refer Mr. Thonn to any other physician.
Mr. Thonn did not return to Dr. Baker until July 6, 2001, at which time he came in asking for an injection for an arthritis related problem in his knee. Mr. Thonn reported no other complaints to Dr. Baker at that time. This was the last time that Dr. Baker saw Mr. Thonn.
On cross-examination, Dr. Baker testified that he had no independent recollection of exactly what he may have asked Mr. Thonn concerning neck or back pain. Dr. Baker explained that:
If the person haswhen a person comes to see me I do, and certainly after a motor vehicle accident, ask them if they have any other problems. And specifically neck and back pain is very common, so I'm sure that I would have asked him at that time.
Dr. Walter Vogt, who had been one of Mr. Thonn's treating physicians, was qualified as an expert in neurology and neurophysiology. Mr. Thonn went to see him in March of 1999, complaining of head and *650 neck pain[8] related to a motor vehicle accident that had occurred approximately fifteen days prior to the visit. He made no complaint of low back pain at that time. However, Mr. Thonn did report a history of sleep apnea, which Dr. Vogt said had nothing to do with the automobile accident. Dr. Vogt responded in the affirmative when asked:
Physical examination at that time was really quite benign. There were no glaring abnormalities on neurological examination.
Dr. Vogt's impression after examination was one of cerebral concussion. He noted that Mr. Thonn had normal squatting ability, the significance of which he explained as follows:
The squatting is a functional test that assesses a number of neurological parameters including proximal muscle strength. It's a quick way to see if someone's balance is working, if their proximal muscles in their thigh are functioning properly, if they have joint pain and so on.
Mr. Thonn also successfully performed similar heel walking, toe walking and tandem tests without pain. The next appointment was scheduled for two weeks later, but Mr. Thonn did not return until approximately eight months later on November 5, 1999. At that time, Mr. Thonn reported that the typical symptoms of concussion had improved, but he now complained of spasm at the base of the neck which was worse when he bent his neck forward. Mr. Thonn also complained of tingling in his hands when driving. Dr. Vogt detected tenderness in the neck, "spasm at the base of the left neck at C-7, right where the C-spine ends the T-spine begins, thoracic spine begins." Dr. Vogt testified that Mr. Thonn had not related any neck complaints when he saw him at the prior visit in March. Mr. Thonn reported that his neck complaints were worse at work when he flexed his neck.
Dr. Vogt concluded that in view of Mr. Thonn's improved concussion related symptoms, there was no further need of neuroimaging of the brain. Dr. Vogt further concluded that Mr. Thonn had "a cervical sprain, likely repetitive trauma, work related." Dr. Vogt related Mr. Thonn's complaints to his job on his fishing boat, much as Dr. Aiken did concerning the plaintiffs' complaints in Lewis v. Ingles, 02-121, p. 9 (La.App. 5 Cir. 7/30/02), 823 So.2d 1033, 1038, writ denied 02-2463 (La.11/22/02), 829 So.2d 1052.
Mr. Thonn's next visit with Dr. Vogt was on November 10, 1999. Dr. Vogt noted:
Well, he at this time complained of back pain and he really didn't have this before. He said it radiated into the hamstring, the muscles in the back of thigh [sic] on both sides, a little but more on the left. There were [sic] some burning, numbness on the right side in front of the thigh.
Dr. Vogt said he had no record of any such complaints from Mr. Thonn either at his first visit in March of 1999 or during the visit on November 5, 1999. Pursuant to these new complaints, Dr. Vogt ordered an MRI which was completed on November 15, 1999. He also performed an electromyography (EMG) and a nerve conduction study. After reviewing all three of these tests, Dr. Vogt concluded that:
I felt that the back, the leg numbness, was mostly likely a nerve that I could not assess coming out at the front of the *651 pelvic area, the lateral femoral cutaneous nerve, a condition called miralgia paresthetic because of the way he was built the nerve was pinched by his abdominal structure causing numbness in the thigh.
Dr. Vogt also noted that Mr. Thonn's sleep apnea had resolved, although the plaintiff is not claiming that the apnea was related to the accident. Dr. Vogt prescribed physical therapy and Benzodiazepine chloroprene to give him improved sleep.
Mr. Thonn's last visit to Dr. Vogt was on February 21, 2000. He gave him a return appointment at that time, but Dr. Vogt's records reflect that Mr. Thonn never returned.
On cross-examination, Dr. Vogt noted that he obtained a description of the accident in his initial consultation with Mr. Thonn. He opined in response to hypothetical questions from the plaintiffs' attorney that if Mr. Thonn had no history of neck or back complaints prior to the accident, but did have such pains after the accident, then it was possible that such pains could be caused by the accident. Dr. Vogt also admitted that in spite of the fact that his studies revealed nothing indicative of leg pain, that such studies did not completely rule out the possibility of leg pain.
Based on the foregoing review of the record, we must conclude that while Mr. Thonn was involved in a roll-over accident, he emerged relatively unscathed with no bleeding or broken bones. The only evidence of damage to internal organs was that of a concussion, which condition resolved itself in time, and testimony concerning his diagnosis of pericarditis, which the jury apparently preferred to attribute to causes other than the accident. We cannot say that no reasonable fact finder could have come to that conclusion, in view of Mr. Thonn's long record of pre-existing heart complaints. There was significant medical testimony, reviewed in detail above, permitting the jury, as a reasonable fact finder, to attribute many of Mr. Thonn's complaints to degenerative conditions arising naturally out of his age, weight and the strenuous nature of his work. Outside of some minor reduction in the range of motion of his neck, there was credible medical evidence that Mr. Thonn suffered from no reduction in the range of motion or use of any of his joints.
Employing the standard called for in Youn, supra, and recognized universally in our jurisprudence, of determining the particular effect of the particular injuries on the particular plaintiff, the jury could have reasonably concluded that in spite of the nature of Mr. Thonn's roll-over accident, he did not suffer significant injuries or disabilities attributable to that accident. The jury award for general damages cannot be said to be unreasonable or the result of passion or prejudice. This is not one of those exceptional cases where the award is so gross as to be contrary to right reason.
For the foregoing reasons, we cannot say that the jury abused its great and vast discretion in the award of general damages.
F. DID THE JURY ERR IN AWARDING MR. THONN ONLY $30,000.00 IN PAST MEDICAL EXPENSES?
Plaintiffs assert that the jury erred in awarding only $30,000.00 in past medical expenses when the plaintiffs presented uncontradicted evidence and testimony proving expenses of $41,161.49. On direct examination, Mr. Thonn identified bills totaling $41,161.49. When plaintiffs counsel offered the bills into evidence in connection with Mr. Thonn's testimony, defense counsel responded:

*652 We've seen the itemization before, but never the collective set of bills. And we probably will have no objections.
Defense counsel made no further reference to Mr. Thonn's medical bills either in cross-examination or in the defense appellate brief and answer to the appeal.
When a plaintiff claims to have incurred medical expenses and those claims are supported by a bill, the proof is sufficient, unless there is contradictory evidence or reasonable suspicion that the bill is unrelated to the accident. Brandao v. Wal-Mart Stores, Inc., 35,368 (La. App. 2 Cir. 12/19/01), 803 So.2d 1039, 1047, writ den. 02-0493 (La.4/26/02), 814 So.2d 558. In this case, the jury could infer that much of Mr. Thonn's medical treatment was unrelated to his collision with Mr. Cook's vehicle. A plaintiff's recovery of medical charges must be confined to those expenses related to the accident. Phiratsamy v. Pipes, 27,209, p. 5 (La.App. 2 Cir. 8/23/95), 660 So.2d 172, 175.
Therefore, while ordinarily past medical expenses are an item of special damages[9] not subject to the same broad discretion afforded the fact finder in matters of general damages, we find that in the instant case, where the jury implicitly found that not all of Mr. Thonn's medical complaints could be attributed to the accident, the assessment of past medical expenses at $30,000.00 represents the reasonable exercise of the jury's discretion under the circumstances.
DECREE
For the foregoing reasons, the judgment of the trial court is amended to increase the award to the plaintiffs for property damage from $5,000.00 to $10,444.95; the judgment is further amended to award the plaintiff, Mrs. Thonn, $2,500.00 for loss of consortium, and as amended, the judgment is affirmed. The defendants are to bear the cost of this appeal.
AFFIRMED AS AMENDED.
NOTES
[1] "he" refers to defense counsel.
[2] Roberts is also relevant to the instant case because Roberts represents another example of a case in which the occurrence of manifest error in certain of the jury's findings did not deprive other findings by the jury of the deference normally afforded them in the absence of manifest error, i.e., manifest error in certain portions of the Roberts case did not warrant a de novo review of all other findings.
[3] See also Smith v. Clement, 2001-87 (La.App. 3 Cir. 10/2/01), 797 So.2d 151, writ den. 01-2878 (La.1/25/02), 807 So.2d 249 and 01-2982 (La.1/25/02), 807 So.2d 843, which sets forth the same definitions.
[4] We are not suggesting that the duty of care owed by the left-turning motorist consists of nothing more that signaling the intention to do so. However, the failure to do so would be a breach of duty and an act of negligence.
[5] For example, in plaintiffs' brief the claim is made that Trooper Whitmore confirmed that Mr. Thonn was traveling at 55 m.p.h., but all he testified to was that Mr. Thonn told him that he was going 55 m.p.h. More importantly, he testified that he did not "take any measurements or make any determinations based on physical evidence at the scene how fast these vehicles were traveling."
[6] Orthopedist.
[7] Prescription strength Aleve.
[8] On cross-examination, Dr. Vogt corrected himself and testified that when he mentioned neck pain at this point in his direct testimony, he meant to refer to pain in the center of Mr. Thonn's forehead.
[9] Mistich v. Pipelines, Inc., 609 So.2d 921 (La.App. 4 Cir.1992).